# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

DEVIN KEITT,

                             Plaintiff,

       v.                                    No. 10-CV-157
                                              (TJM/CFH)

PAUL ANNETTS, Downstate Correctional Facility;
DALE ARTUZ, Clinton Correctional Facility;
JOSEPH BELLNIER, Upstate Correctional Facility;
BRIAN FISCHER, Commissioner of D.O.C.S;
LUCIEN LECLAIRE, Deputy Commissioner of
D.O.C.S; NORMAN BEZIO, D.O.C.S. Inmate
Disciplinary Program Director of Special Housing
Units (SHU); ALBERT PRACK, Acting S.H.U.
Director; STATE OF NEW YORK; T. DUNNING,
Correction Officer,

                          Defendants.[1]

_____

**APPEARANCES:**                            **OF COUNSEL:**

DEVIN KEITT
06-A-2122
Plaintiff Pro se
Coxsackie Correctional Facility
Box 999
Coxsackie, NY 12051

HON. ERIC T. SCHNEIDERMAN        DOUGLAS J. GOGLIA, ESQ.
Attorney General for the               Assistant Attorney General
  State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224-0341

**CHRISTIAN F. HUMMEL**

_____

[1] By Decision and Order dated September 22, 2011, all claims against defendants Corbine, Snyder, LaBounty, Bush, Duvall, Chase, Anctil, Bullis, and John Does #1–4 were dismissed. Dkt. No. 69 at 3. Further, the New York State Department of Correctional Services merged with the Division of Parole and is now the New York State Department of Corrections and Community Supervision.

**U.S. MAGISTRATE JUDGE**

**REPORT-RECOMMENDATION AND ORDER**[2]

Plaintiff pro se Devin Keitt ("Keitt"), an inmate in the custody of the New York State Department of Correctional and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that the State of New York and eight officials and employees of DOCCS violated his constitutional rights under the Fourteenth Amendment. Compl. (Dkt. No. 1). Keitt also asserts claims pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.. Id. Presently pending is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 and attorney's fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205. Dkt. No. 87. On November 29, 2012, by telephone conference, Keitt orally responded to defendants' motion.[3] See Dkt. report entry dated 11/21/2012. For the following reasons, it is recommended that defendants' motion for summary judgment be granted and motion for attorney's fees be denied.

## I. Background

The facts are related in the light most favorable to Keitt as the non-moving party. See subsection II(A) infra. The specific facts of the case are set forth in the Report-Recommendation and Order filed July 25, 2011, familiarity with which is assumed. See Dkt.

---

[2] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[3] By text orders, this Court granted Keitt two extensions to file a written response to defendants' motion. Dkt. report entry dated 8/27/2012 (extending deadline to September 28, 2012); Dkt. report entry dated 10/18/2012 (extending deadline to November 8, 2012). Upon Keitt's failure to file a response by November 8, 2012, defendants requested that the Court allow Keitt to orally respond to the instant motion. Dkt. No. 96.

No. 67 (Report-Recommendation); Dkt. No. 69 (Decision and Order affirming in substantial part the findings in the Report-Recommendation). Specifically, the Court dismissed all of Keitt's claims except the (1) ADA reasonable accommodation claim insofar as it is claimed that Keitt requested, but did not receive, an inmate assistant to help him through the disciplinary process and (2) Fourteenth Amendment Due Process claim alleging inadequate assistance. Dkt. No. 67 at 13–15, 19–20; Dkt. No. 69 at 3. The facts discussed will be those relevant to the claims herein remaining. Those claims occurred during Keitt's incarceration at Clinton Correctional Facility ("Clinton") and Upstate Correctional Facility ("Upstate").

### A. Dyslexia

Keitt is an inmate who claims that, before the age of fourteen, he was diagnosed with dyslexia, which "limits his ability to read, write, comprehend, work, or perform."[4] Compl. ¶ 23. To support his contention, Keitt produced an "Individualized Education Program" ("IEP") form dated May 1995, which classified him as "learning disabled/emotionally

---

[4] Dyslexia has been defined as

> [A] brain-based type of learning disability that specifically impairs a person's ability to read. These individuals typically read at levels significantly lower than expected despite having normal intelligence. Although the disorder varies from person to person, common characteristics [include] . . . difficulty with phonological processing (the manipulation of sounds) [, spelling,] and/or rapid visual-verbal responding.

Frank v. Plaza Const. Corp., 186 F. Supp. 2d 420, 434 (S.D.N.Y. 2002) (citing National Institute of Neurological Disorders and Stroke, NINDS Dyslexia Information Page, at http://www.ninds.nih.gov/disorders/dyslexia/dyslexia.htm (last visited Nov. 15, 2012)).

disturbed." IEP Form (Ex. 2 attached to Defs.' Mot. for Summ. J.) (Dkt. No. 87-8). Other

than the IEP form, the record contains no other evidence indicating that Keitt was

diagnosed with dyslexia. Keitt Dep. (Dkt. No. 87-7) at 11–12. Keitt clarified that he is

dyslexic, not illiterate. Id. at 42. Specifically, Keitt can read bold print that is within his

unknown reading level. Id. at 42–43.

Non-party Hollmen, the director of education for DOCCS, reviewed Keitt's records and

opined that nothing in those records indicated that Keitt is dyslexic. Hollmen Decl. (Dkt. No.

87-4) ¶ 3. The Test of Adult Basic Education ("TABE")[5] was administered to Keitt several

times during his incarceration. Id. In April 2006, the TABE was administered to Keitt, who

scored a 8.7 grade level in reading and 7.0 level in math. Id. ¶ 9. In September 2007, Keitt

was retested and scored a 5.6 grade level in reading and 8.2 level in math. Id. Both

English proficiency scores indicated that Keitt could read proficiently. Id. ¶ 10. In February

2011, after Keitt commenced this lawsuits, Keitt scored 0.0 in English and 1.2 in math. Id. ¶

11.

In response to Keitt's allegation that he cheated on the April 2006 and September 2007

TABE exams by asking another inmate to take them on his behalf, Hollmen stated that

given the security protocols at maximum security prisons, it was highly unlikely that Keitt

could have cheated as he alleged.[6] Hollmen Decl. ¶ 12. This is because inmates were

---

[5] "The TABE is a standardized test used for assessment in many adult education programs. In DOCCS, the test is used initially to determine placement and then to measure progress. It is a timed test and contains subtests for reading, math and language arts. DOCCS uses the reading and math portions, which measure reading comprehension, math computation and math problem solving skills." Hollmen Decl. ¶ 4.

[6] During his deposition, Keitt explained that he cheated on the April 2006 TABE by having someone else take the exam on his behalf because he did not want to receive a

4

required to present their identification cards before sitting for the TABE exam, and take the

TABE exam in assigned seats. Id. More importantly, the TABE exams were proctored by

the same teachers who taught the inmates in the regular classes; thus, a teacher would

have recognized that an inmate cheated by substituting himself with another inmate. Id.


**B. Disciplinary Hearing Dated October 17, 2007**

On October 11, 2007, Keitt arrived at Clinton. Compl. ¶ 31. Keitt was served a

misbehavior report on October 12, 2007 and a disciplinary hearing was held on October 17,

2007. Misbehavior Report #1 (Dkt. No. 1-1) at 6; Tier III Hearing #1 (Dkt. No. 87-13);

Assistant Form #1 (Ex. 4 attached to Defs.' Mot. for Summ. J.) (Dkt. No. 87-10) at 4. Keitt

selected Rocheleau as his assistant and chose to have a translator or interpreter present at

his hearing. Assistant Selection Form (Ex. 3 attached to Defs.' Mot. for Summ. J.) (Dkt. No.

87-9). Keitt also requested and received a copy of Directive #2612 addressing inmates with

sensorial disabilities and a review of the video tape of the incident underlying the report.

Assistant Selection Form #1; Keitt Dep. at 33; Directive #2612 (Dkt. No. 1-1) at 73.

At the hearing's inception, Keitt confirmed that he received a copy of the misbehavior

report and met with his assistant on the day before the hearing. Tier III Hearing #1 at 2, 4.

Throughout the hearing, Keitt repeatedly announced that he could not read certain

documents placed in front of him, had difficulties hearing, did not understand witnesses'

testimonies, and required an interpreter. Id. at 2–3, 6, 8, 17–18, 25. Keitt admitted in his

---

low score and be forced to take certain classes. Keitt Dep. at 13. Keitt also explained that
he cheated on the September 2007 TABE because he required a sufficiently high score to
stay in a particular class with Inmate Miller. Id. at 17–19.

deposition that he knew one word in American Sign Language ("ASL") and never communicated by ASL; however, he attempted to explain that he did not specifically require an ASL interpreter, but an interpreter to assist him with hearing and reading difficulties. Keitt Dep. at 39, 66–69.

Non-party Hearing Officer Drown examined non-party Welch, a correction counselor who worked with Keitt and spoke with Keitt and did not notice that Keitt had hearing loss. Tier III Hearing #1 at 10–11. In addition, Keitt never indicated to Welch that he could not communicate without a translator. Id. at 10. To substantiate his opinion of Keitt's communication abilities, Welch testified that he had to explain to Keitt the definition of "security level" because Keitt was a scheduled transfer and that it would have been "quite evident" if Keitt did not understand some of the "conceptual things" involved in that conversation. Id. at 13.

Drown also examined non-party Mahuta, correction officer who worked on Keitt's block for six months. Tier III Hearing #1 at 14. Drown pointed to Keitt's records, which contained Keitt's allegation that he cannot hear out of one of his ears. Id. at 14. Mahuta testified that Keitt placed a sign outside the cell stating that Keitt had hearing difficulties; however, Mahuta spoke with Keitt on a daily basis in a "normal sounding voice" and Keitt always responded appropriately and was never slow in voicing his words. Id. at 14–17. Drown concluded that both Welch and Mahuta always spoke with Keitt verbally in English. Id. at 10, 18. Ultimately, Drown found that Keitt did not require an interpreter and was guilty of all charges. Id. at 26. Drown sentenced Keitt to twenty-four months in Special Housing Unit

("SHU")[7] confinement with loss of packages, commissary, and phone.  Id.

### C. Disciplinary Hearings Dated November 19, 2008

On November 8, 2008, Keitt was served two misbehavior reports while he was incarcerated at Upstate.  Compl. ¶¶ 72–81, 91; Misbehavior Reports #2 and #3 (Exs. F, G, attached to Compl.) (Dkt. No. 1-1) at 27–32.  Prior to the disciplinary hearings for these reports, non-party Officer Fish assisted Keitt by interviewing a witness and arranging for the viewing of a video.  See Assistant Form #2 (Ex. 6 attached to Defs.' Mot. for Summ. J.) (Dkt. No. 87-12); Assistant Form #3 (Ex. 5 attached to Defs.' Mot. for Summ. J.) (Dkt. No. 87-11).  Keitt also requested that an interpreter be present for the hearing and Fish noted that Keitt's medical records stated that Keitt could hear.  Id.

On November 19, 2008, at the disciplinary hearing held for one of the two reports, Keitt informed Hearing Officer Bullis that he was hard of hearing and required an interpreter. See, e.g., Tier III Hearing #2 (Dkt. No. 87-14) at 3–6, 12, 15, 17, 19, 22.  Bullis attempted to determine whether Keitt had hearing difficulties by calling non-party Nurse Lordy to the hearing and requesting that Keitt grant Lordy permission to testify as to his hearing impairments.  Id. at 6–7.  Despite Keitt's refusal to grant approval, Bullis received permission from the nurse administrator's office to allow for Lordy's testimony.  Id. at 10–12. Based on Keitt's medical chart, Lordy testified that Keitt could hear.  Id. at 12.

---

[7]  SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

After Lordy gave her testimony, Bullis stated

> I am going to note for the record that when I adjourned the
> hearing [Keitt was] still in the hearing room and the sergeant
> came in . . . I myself observed a conversation that [Keitt] had
> with the sergeant consisting of . . . several minutes regarding
> [Keitt's] level changes, [Keitt's] sneakers, the conversation was
> in a regular tone of voice, no where near as loud as I'm talking
> right now, [Keitt] responded to the sergeant, [Keitt] answered his
> questions and appeared to have absolutely no problem
> whatsoever communicating and carrying on a conversation, a
> two way conversation . . . .

Tier III Hearing #2 at 13. Two officers, non-parties Hastings and Richards, were present

during the same conversation and confirmed Bullis's observations. Id. Richards further

testified that while he was escorting Keitt in the hall, Keitt understood and followed all

orders given to him. Id. Non-party Sergeant Koroufsky, involved in the conversation

referenced by Bullis, also stated on the record that he spoke with Keitt in a normal tone of

voice and Keitt understood the contents of the conversation. Id. at 15. Finally, non-party

Sergeant Lombard, who investigated the incident underlying the misbehavior report,

testified that he interviewed Keitt and nothing in that conversation indicated to him that Keitt

had hearing difficulties. Id. 18–19.

Ultimately, based on the misbehavior report and Lombard's testimony, Bullis found Keitt

guilty of the charge in the report. Tier III Hearing #2 at 21. Further, based on the

testimonies of Lordy, Koroufsky, Hastings, Richards, Lombard, and his own observations,

Bullis found that Keitt had no hearing difficulties that would prevent him from fully

participating at the hearing. Id. Bullis sentenced Keitt to four months of SHU confinement

with loss of packages, commissary, phone privileges, and good time credit. Id. at 22.

Bullis also conducted the disciplinary hearing for Keitt's third misbehavior report. Tier III

8

Hearing #3 (Dkt. No. 87-15).  Keitt continued to object to the hearing and requested an interpreter.  See, e.g., id. at 4–5, 9–11.  Hastings, Richards, Kourofsky, and Lordy testified to the same facts as they did at the second disciplinary hearing.  Id. at 6–10.  Richards further testified that when he called Keitt to the cell door and asked Keitt whether he wanted to attend the hearing, Keitt followed his orders, understood the question, and attended the hearing.  Id. at 7.  Based upon the testimonies of Hastings, Richards, Kourofsky, Lordy, and his own observations, Bullis found that there was sufficient evidence indicating that Keitt had no hearing difficulties and continued to hold the disciplinary hearing.  Id. at 12–13.  Towards the end of the hearing, Keitt asked questions and responded to the interchange between Bullis and the witnesses.  See id. at 19–21.  At the end of the hearing, Bullis concluded that Keitt was guilty and sentenced Keitt to three months of SHU confinement with loss of packages, commissary, phone privileges, and good time credits.  Id. at 23.

## II.  Motion for Summary Judgment

Keitt sues the defendants in both their official and individual capacities.  Compl. ¶¶ 8–10, 12.  He contends that his (1) ADA right to receive reasonable accommodation was violated when he was denied inmate assistants for his disciplinary hearings and (2) Fourteenth Amendment Due Process rights were violated when he was denied adequate assistance during the same disciplinary proceedings.  Defendants contend that both these claims are meritless.  Defendants also contend that they are entitled to qualified immunity with respect to Keitt's Due Process claim.

**A.  Legal Standard**

A motion for summary judgment may be granted if there is no genuine issue as to any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law.  The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Facts are material if they may affect the outcome of the case as determined by substantive law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party.  Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223–24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest arguments that they "suggest," . . . .  At the same time, our cases have also

10

> indicated that we cannot read into pro se submissions claims
> that are not "consistent" with the pro se litigant's allegations, . . .
> or arguments that the submissions themselves do not "suggest,"
> . . . that we should not "excuse frivolous or vexatious filings by
> pro se litigants," . . . and that pro se status "does not exempt a
> party from compliance with relevant rules of procedural and
> substantive law . . . ."

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191–92 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, . . . a court is obliged to construe his pleadings liberally.'" (citations omitted)).  However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion; the requirement is that there be no genuine issue of material fact.  Anderson, 477 U.S. at 247–48.


## B.  ADA Claim

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of . . . a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The ADA "applies to inmates in state prisons."  Beckford v. Portuondo, 151 F. Supp. 2d 204, 220 (N.D.N.Y. 2001) (citations omitted).  To state a claim under the ADA, an inmate must demonstrate that

> (1) he or she is a "qualified individual with a disability"; (2) he or
> she is being excluded from participation in, or being denied the
> benefits of some service, program, or activity by reason of his or
> her disability; and (3) [the facility that] provides the service,
> program or activity is a public entity.

Clarkson v. Coughlin, 898 F. Supp. 1019, 1037 (S.D.N.Y. 1995); 42 U.S.C. § 12132.

11

As to the first element, a person is an individual with a qualified disability if "(A) a physical or mental impairment . . . substantially limits one or more of the major life activities of such individual, (B) [there is] a record of such an impairment, or (C) [the individual is] being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).

> To determine if an individual meets any of the above criteria, courts apply a three part test . . . First, a plaintiff must show that [he or] she suffers from a physical or mental impairment. Second, the plaintiff must establish that the activity [he or] she alleges to be impaired constitutes a "major life activity." Third, the plaintiff must show that [his or] her impairment "substantially limits" the major life activity previously identified.

Smith v. Masterson, 538 F. Supp. 2d 653, 657 (S.D.N.Y. 2008) (internal citations omitted).

Major life activities include "hearing, . . . reading, . . . thinking, [and] communicating, . . . ." 29 C.F.R. § 1630.2(i)(1). The Second Circuit has held that it is important to

> distinguish[] between (I) making reasonable accommodations to assure access to an existing program and (ii) providing additional or different substantive benefits . . . [since] the disability statutes do not require that substantively different services be provided to the disabled, no matter how great their need for services may be. They require only that covered entities make "reasonable accommodations" to enable "meaningful access" to such services as may be provided, whether such services are adequate or not.

Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000) (citations omitted).

Keitt has failed to establish the first prong. The record belies Keitt's assertion that his alleged impairments limit his ability to hear, read, think, or communicate in a substantial manner. A number of witnesses testified at Keitt's disciplinary hearings that they never experienced difficulty in conversing with Keitt concerning orders, directions, and transfers. Morever, Keitt's hearing officer Bullis, supported by witness testimony, observed the same when Keitt successfully engaged in a discussion concerning his level changes and personal

12

property.  Further, Keitt demonstrated throughout the disciplinary proceedings that he could hear, think, and communicate by selecting inmate assistants, requesting specific types of evidence, and asking and responding to questions.  See, e.g., Tier III Hearing #3 at 18–21. Keitt conceded that he can read within a certain, though unknown, grade level.  Finally, the record neither contains a documented history of Keitt's alleged impairments nor that Keitt was regarded by others as having such impairments.[8]  See, e.g., Tier III Hearing #1 at 10–11, 14–17; Tier III Hearing #2 at 6–7, 12–15, 18–19; Tier III Hearing #3 at 6–10.  In fact, during the time in question, Keitt's TABE scores indicate that he could read proficiently.[9] Because a rational fact finder would not find that Keitt has an impairment that substantially limits a major life activity, Keitt has failed to establish the first prong.

While it is undisputed that Keitt has established the third prong, as DOCCS is a public entity, Clarkson, 898 F. Supp. at 1044, Keitt has failed to establish the second prong.  The record is devoid of evidence indicating that, by reason of his alleged impairments, Keitt was denied assistance for marshaling his defenses during the disciplinary hearings.  In fact, Keitt was provided with assistance.  Both Hearing Officers Drown and Bullis made findings of fact upon Keitt's requests for an interpreter and concluded that Keitt's allegations with

---

[8]  Keitt submitted evidence that a third-party, Inmate King, drafted the complaint on his behalf and attached an affidavit to the complaint stating that Keitt is dyslexic.  Dkt. No. 1-1.  Despite this conclusory statement, considering the testimonies of a number of DOCCS employees, a rational fact finder would not find in favor of Keitt on the matter of whether others view him as having dyslexia.

[9]  Despite Keitt's allegations, which are unsupported in light of the additional safeguards and precautions outlined by the defendants, even assuming that Keitt cheated on the two TABE exams as he alleged, his low TABE score dated February 2011 occurred subsequent to the nucleus of facts underlying this action.  Thus, Keitt's low TABE scores do not save his ADA claim.

respect to his impairments were not credible.  Thus, Keitt failed to show a genuine issue of fact concerning the second prong.  Accordingly, defendants' motion on this ground should be granted.

Assuming that Keitt has successfully established the three-prong test for an ADA claim, Keitt's contention that he was denied reasonable accommodations in that he was precluded from the assignment of inmate assistants is unsubstantiated by the record.  Keitt selected Rocheleau as his assistant for the first disciplinary hearing and confirmed that he received a copy of the requested Directive #2612 and a viewing of the videotape.  Assistant Selection Form at 1; Keitt Dep. at 32–33, 38–39.  Similarly, Fish assisted Keitt with the preparation for the second and third disciplinary hearings by gathering evidence for Keitt's defense such as interviewing a witness and arranging for the viewing of a videotape.  Thus, despite Keitt's conclusory allegations, the inmate assistants responded to and produced Keitt's various requests, providing Keitt with reasonable accommodations for any shortcomings that Keitt felt he suffered in preparing for the disciplinary hearings.  Accordingly, defendants' motion on this ground should be granted.


### C.  Due Process

Keitt contends that his due process rights were violated because he was denied adequate assistance during his disciplinary hearings, which led to his confinement in SHU.  However, "the Constitution d[oes] not require that restrictive confinement within a prison be preceded by procedural due process protections unless the confinement subjected the prisoner to atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Colon v. Howard, 215 F.3d 227, 230 (2d Cir. 2000) (citing Sandin v.

14

<u>Conner</u>, 515 U.S. 472, 484 (1995)) (internal quotation marks omitted).

### 1. Atypical and Significant

As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property.  <u>See</u> <u>Perry v. McDonald</u>, 280 F.3d 159, 173 (2d Cir. 2001).  To establish a protected liberty interest, a prisoner must satisfy the standard set forth in <u>Sandin</u>.  This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life.  <u>Id.</u> at 484; <u>Jenkins v. Haubert</u>, 179 F.3d 19, 28 (2d Cir. 1999); <u>Frazier v. Coughlin</u>, 81 F.3d 313, 317 (2d Cir. 1996).  The fact that an inmate has been disciplined with segregated confinement alone is insufficient to establish an atypical and significant deprivation.  The Second Circuit has articulated a two-part test whereby the length of time a prisoner was placed in segregation as well as "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population" are to be considered.  <u>Vasquez v. Coughlin</u>, 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998).

While not a dispositive factor, the duration of a disciplinary confinement is a significant factor in determining atypicality.  <u>Colon v. Howard</u>, 215 F.3d 227, 231 (2d Cir. 2000) (citations omitted).  The Second Circuit has not established "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights."  <u>Palmer v. Richards</u>, 364 F.3d 60, 64 (2d Cir. 2004) (citations omitted).  Instead, the Second Circuit has provided guidelines that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of confinement relative to ordinary prison conditions is required."  <u>Id.</u> at 64–65 (citing <u>Colon</u>,

215 F.3d at 232).  In the absence of a dispute about the conditions of confinement, summary judgment may be issued "as a matter of law."  Id. at 65 (citations omitted).  Conversely, where an inmate is confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality.  Id. (citing Colon, 215 F.3d at 231–32).  Additionally, "[i]n the absence of a detailed factual record, [the Second Circuit] has affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than . . . [thirty] days—and there was no indication that the plaintiff endured unusual SHU conditions."  Id. (citations omitted); see also Smart v. Goord, 441 F. Supp. 2d 631, 640 (holding that Second Circuit decisions "are unanimous that keeplock of [thirty] days or less in New York prisons is not atypical or significant . . . under Sandin.") (internal quotations marks and citations omitted).

In making his due process claim, Keitt has successfully demonstrated that his deprivation was atypical and significant.  Altogether, Keitt was sentenced to thirty-one months of SHU confinement, which amounts to approximately 940 days.  Tier Hearing #1 at 26; Tier Hearing #2 at 22; Tier Hearing #3 at 23.  There is no indication that the time which Keitt spent in SHU was in any way unusual or atypical.  Given the status of a detailed factual record, because Keitt was confined under normal SHU conditions for a duration in excess of an intermediate disposition, the length of the confinement itself is sufficient to establish atypicality.  Therefore, Keitt has established a liberty interest for purposes of a due process claim.

## 2. Procedural Due Process

While inmates are not given "the full panoply of [due process] rights," they are still afforded procedural process. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). A prisoner is "entitled to advance written notice . . . ; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition including the evidence relied upon and the reasons for the disciplinary actions taken." Sira v. Morton, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

In addition, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." Eng v. Coughlin, 858 F.2d 889, 897 (2d Cir. 1988). Such assistance is intended to aid inmates to "gather[] evidence, obtain[] documents and relevant tapes, and interview[] witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself." Id. at 898. In disciplinary settings, inmates requiring counsel may "seek the aid of a fellow inmate, or . . . have adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." Wolff, 418 U.S. at 570. Any violations of this right to assistance are reviewed to assess "whether the error was harmless or prejudicial." Powell v. Coughlin, 953 F.2d 744, 750 (2d Cir. 1991).

Keitt has failed to show a triable issue of fact with regard to his Due Process claim. Keitt contends that the misbehavior reports were not explained to him; thus, he was unable to marshal defenses during his disciplinary hearings. However, Keitt specifically testified that he understood the charges in the first misbehavior report. Keitt Dep. at 34–35.

17

Further, as discussed supra, Keitt had inmate assistants for all three disciplinary hearings and requested and was provided with specific evidence from them to prepare his defense. Moreover, Keitt demonstrated that he was able to call witnesses by requesting Fish to interview a potential witness, Inmate Givens, in connection to one of the misbehavior reports. Assistant Form #2 (indicating that the request to obtain an interview with Givens was completed); see also Assistant Forms # 1, 3 (noting that no potential witnesses were requested to be interviewed). Therefore, Keitt received all the assistance he was due from his inmate assistants; thus, Keitt was provided with adequate due process for the disciplinary proceedings. Accordingly, defendants' motion on this ground should be granted.

### D. Qualified Immunity

Defendants claim that even if Keitt's constitutional claims are substantiated, they are nevertheless entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229–30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 F. App'x 146 (2d Cir. Nov. 10, 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230. Here, the second prong of the inquiry need not be addressed with respect to Keitt's Fourteenth Amendment Due Process claim because, as discussed supra, it has not been shown that defendants violated Keitt's Fourteenth Amendment rights.

### III. Motion for Attorney's Fees

42 U.S.C. § 1988(b) provides that, "[i]n any action or proceeding to enforce a provision of [section 1983] . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . ." A prevailing party is one who achieves some material alteration of the legal relationship of the parties that is also judicially sanctioned, that is, the material change bears "judicial imprimatur." Perez v. Westchester Cnty. Dep't. of Corr., 587 F.3d 143, 149 (2d Cir. 2009) (citing Roberson v. Giuliani, 346 F.3d, 75, 79–80 (2d Cir. 2003)). For example, judicial imprimatur may include a judgment on the merits, a consent decree, a judicially enforceable settlement, or an order of settlement. Id. at 150, 153.

A defendant may receive § 1988 attorney's fees for defending a frivolous suit. Fox v. Vice, __ U.S. __, __, 131 S. Ct. 2205, 2211 (2011). Thus, "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation," a district court may award attorney's fees to the defendant. Id. at 2213 (citing Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 421 (1978), Kentucky v. Graham, 473 U.S. 159, 165 (1985)).

19

The ADA also provides that a district court "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs . . . ." 42 U.S.C. § 12205. Similar to the standard under § 1988, for ADA claims, fees are awarded to prevailing defendants only when the plaintiff's claim is frivolous, unreasonable, or groundless. Parker v. Sony Pictures Entertainment, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (internal quotation marks and citations omitted).

Here, it is recommended that defendants' motion for attorney's fees pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 12205 be denied. Defendants assert that they are entitled to $10,290.00 in fees based on their counsel's legal experience and the prevailing rate for experienced litigators. Goglia Decl. (Dkt. No. 87-6) ¶ 17. It cannot be said that Keitt's action was frivolous, that is, the action embraces both "inarguable legal conclusion[s]" and fanciful factual allegation[s]," as Keitt does experience difficulty, though not substantially limiting, in communication with others. Tafari v. Hues, 473 F.3d 440, 442 (2d Cir. 2007) (citation omitted). Further, in light of the fact that Keitt is currently incarcerated, $10,290.00 would be an unreasonable amount to be withdrawn from Keitt's prison account. Accordingly, defendants' motion for attorney's fees should be denied.


## IV. Conclusion

For the reasons stated above, it is hereby:

1. **RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 87) be **GRANTED** as to Keitt's ADA and Fourteenth Amendment Due Process claims and Keitt's complaint be **DISMISSED** with prejudice.

2. Further **RECOMMENDED** that defendants' motion for attorney's fees (Dkt. No. 87)

20

be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 72, 6(a), 6(e).


Dated:  December 3, 2012
        Albany, New York

_Christian F. Hummel_
Christian F. Hummel
U.S. Magistrate Judge